UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LAMAR MOORE**,  Plaintiff, v. **TAYLOR VOLPE**,  Defendant. | Civil Action No. 14-cv-2130 (TSC) |

## MEMORANDUM OPINION

Plaintiff Lamar Moore brings this action against Defendant Metropolitan Police Department Officer Taylor Volpe, in his official and individual capacities, for alleged intentional misconduct by falsely arresting, detaining, and assaulting Plaintiff. Plaintiff seeks compensatory and punitive damages for common law and constitutional violations. Defendant has moved for summary judgment, and for the reasons stated herein, Defendant's motion is GRANTED.

### I.     BACKGROUND

On August 9, 2013, an armed robbery took place at the Newtown Food Mart in Northeast Washington, D.C. (Mot. for Summ. J., Def.'s Statement of Undisputed Material Facts ("SOUMF") ¶ 4). Following the robbery, Defendant was canvassing an area just over half a mile from the scene of the crime, searching for a suspect in the robbery.[1] (*Id*. ¶¶ 3, 5). An initial radio lookout described the suspect as a tall, light-skinned African-American male with a bald

---

[1] Plaintiff alleges that after he had been stopped, he overheard broadcast lookouts for two suspects, neither of whom matched Plaintiff in description; however Plaintiff agrees that "the lookout was for a tall, light-skinned individual with a large gun, a light colored shirt and a bald head." (Pl.'s Resp. to Def.'s SOUMF ¶ 3).

1

head, wearing a multi-colored shirt, and armed with a large weapon.  (*Id*. ¶ 6; Pl.'s Resp. to Def.'s SOUMF ¶ 6).  Subsequent modifications changed the shirt color to "light colored," and described the suspect as tall with a medium complexion.  (Def.'s SOUMF ¶ 6; Pl.'s Resp. to Def.'s SOUMF ¶ 6).  The initial lookout and subsequent radio traffic did not mention the suspect fleeing in a vehicle, so Defendant, based on his training and experience, believed the suspect was on foot. (Def.'s SOUMF ¶ 8; Mot. for Summ. J., Ex. 2, Def. Dep: 51:5-52:4).

As Defendant drove by 1423 Jackson Street NE, Plaintiff had just finished jogging and was stopped in front of his home at that address.  (Am. Compl. ¶ 5; Def.'s SOUMF ¶ 1-2). Plaintiff is an African-American male with a bald head and mustache, who stands 5'6", and at the time was wearing a white shirt and was kneeling down beside a parked vehicle to catch his breath.  (Def.'s SOUMF ¶ 7; Am. Compl. ¶ 6).  Spotting Plaintiff crouched over, and believing that Plaintiff substantially matched the radio lookouts based on his sex, race, clothing, proximity to the Newton Food Mart, and the fact that he appeared to have been running, Defendant pulled his patrol car over and asked Plaintiff what he was doing.  (Def.'s SOUMF ¶¶ 9-10; Am. Compl. ¶ 6).  Plaintiff responded that he had just finished running, and lived at the home immediately behind him.  (Am. Compl. ¶ 6).  Defendant exited his vehicle, informed Plaintiff that he matched the description of a suspect in an armed robbery, and told Plaintiff to put his hands on his head. (*Id.* ¶¶ 6-7; Def.'s SOUMF ¶ 11).  Plaintiff refused to put his hands on his head, remained in a kneeling position, and told Defendant that he had done nothing wrong.  (Am. Compl. ¶ 7; Def.'s SOUMF ¶12).  Defendant told Plaintiff once again to put his hands on his head, drew his weapon—keeping it pointed at the ground and behind his right leg—and radioed for backup. (Pl.'s Resp. to Def.'s SOUMF ¶ 11; Mot. for Summ. J., Ex. 2, Def. Dep. 17:17-21).  Plaintiff does not allege that Defendant pointed his weapon at him at any point during this initial stop.

(Mot. for Summ. J., Ex. 1, Pl. Dep. 21: 15-18; Pl.'s Resp. to Def.'s SOUMF ¶ 11). While waiting for backup to arrive, Defendant remained standing beside his patrol car and spoke with Plaintiff, who continued to refuse to place his hands on his head. (Def.'s SOUMF ¶¶ 13-14). Plaintiff alleges that during this time, he overheard updated radio descriptions of the armed robbery suspects from Defendant's police radio, and told Defendant that he did not match the description of the suspect, since he was only 5'6", and had been alone in front of his house.[2] (Am. Compl. ¶ 7; Pl.'s Opp'n., Ex. C).

When backup arrived—according to Plaintiff about fifteen minutes later—the responding officers again ordered Plaintiff to put his hands on his head, and Plaintiff continued to refuse, instead placing his arms out to his side. (Def.'s SOUMF ¶¶ 15, 17). Plaintiff alleges that at this point, the officers drew their weapons and pointed them at him, and an unnamed officer frisked and then handcuffed him. (*Id.* ¶ 18; Am. Compl. ¶ 8). After Plaintiff had been handcuffed, the Defendant approached him and checked to make sure that the handcuffs were put on properly. (Def.'s SOUMF ¶ 19). The officers then moved Plaintiff over to, but not in, Defendant's patrol car, and questioned him. (Am. Compl. ¶ 8).

Sometime after backup arrived, Plaintiff's mother approached the officers and Plaintiff asked her to retrieve his identification from their home. (*Id.*). Plaintiff's mother returned with her son's identification and showed it to the officers. (*Id.*). Two to three minutes after being provided Plaintiff's identification showing that he lived at 1423 Jackson St NE, the officers removed Plaintiff's handcuffs. (Def.'s SOUMF ¶ 21). Plaintiff alleges that the total time from

---

[2] While Plaintiff alleges that he overheard descriptions of two suspects, (Am. Compl. ¶ 7), the radio runs, provided by Plaintiff, make it clear—as Defendant has maintained the entire time—that Defendant was looking for a single suspect. (Pl.'s Opp'n. Ex. C). The court does not view this as a material fact.

when Defendant initially approached him to when the handcuffs were taken off lasted "for what seemed like a minimum of one-hour." (Am. Compl. ¶ 10).

After the handcuffs were removed, Plaintiff asked Defendant to call a supervisor to the scene, and Defendant complied. (Def.'s SOUMF ¶ 22). The supervisor arrived at Plaintiff's home about ten minutes later, and asked Defendant to leave. (*Id.* ¶ 23). Plaintiff did not seek any medical attention following the incident, and at no point during his detention did he complain about the handcuffs or their application. (*Id.* ¶¶ 19, 26).

Based on the documents appended to Defendant's notice of removal, it appears that Plaintiff filed a *pro se* complaint against the Metropolitan Police Department's Fifth District on June 23, 2014 in D.C. Superior Court. (Notice of Removal, Ex. 2 at 4). After procuring counsel, Plaintiff then filed an amended complaint, naming Volpe and the District of Columbia as defendants, and asserting three counts: (i) common law false arrest, (ii) assault/battery, and (iii) deprivation of his civil rights in violation of 42 U.S.C. § 1983. (Notice of Removal ¶ 1; Am. Compl., *generally*). On November 14, 2014, the Superior Court dismissed the lawsuit in its entirety. (Notice of Removal ¶ 2). On December 6, 2014, the Superior Court vacated the dismissal as to Defendant Volpe only, and he removed the action to this court. Defendant then filed his motion for summary judgment on July 13, 2015. (*Id.* ¶ 3).

## II.     LEGAL STANDARD

Summary judgment is appropriate where there is no disputed genuine issue of material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party

bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quotation marks omitted). The nonmoving party, in response, must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*., at 249.

III.   ANALYSIS

A.  Constitutional and Common Law False Arrest (Counts I and III)

"The elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim, *Scott v. D*ist. of Columbia, 101 F.3d 748, 753 (D.C. Cir. 1996), which are "that the plaintiff was arrested against his will and that the arrest was unlawful."[3] *Rice v. D.C*., 774 F. Supp. 2d 18, 21 (D.D.C. 2011). Thus the court examines both false arrest claims as if they were one, and "[t]he focal point of the action is the question whether

---

[3] The Court analyzes Plaintiff's Section 1983 claim as a constitutional false arrest claim. "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citation omitted). Thus a court must identify a specific constitutional right infringed, and here, Plaintiff claims he was unlawfully seized. (Am. Compl. para 20). "A seizure may be unreasonable both because it was unjustified by the circumstances—i.e., the police lacked probable cause to arrest or reasonable suspicion to seize the suspect—or because the force used to effectuate it was excessive." *Robinson v. Dist. of Columbia*, No. CV 09-2294 (JEB), 2015 WL 5442434, at *8 (D.D.C. Sept. 15, 2015).

the arresting officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting officer is privileged and the action fails." *Scott*, 101 F.3d at 755 (citing *Dellums v. Powell*, 566 F.2d 167, 175 (D.C. Cir. 1977)).

Plaintiff alleges that Defendant's stop and detention of him constituted an unlawful arrest, because he was "wrongfully and unlawfully arrested and detained" without probable cause or reasonable suspicion. (Am. Compl. ¶ 14). Plaintiff further alleges that Defendant acted "with deliberate indifference to and in reckless disregard for the safety and well-being of the plaintiff and in violation of the 4th Amendment" by committing or failing to "prevent others from committing acts which deprived plaintiff of his Constitutional right to be free from an unreasonable seizure." (*Id.* ¶ 20). Defendant does not raise a qualified immunity defense in his motion for summary judgment, but instead argues that his encounter with Plaintiff was a "classic example of a *Terry* stop," and therefore lawful. (Mot. for Summ. J. at 5).

While "[t]he Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.'" *Terry v. Ohio*, 392 U.S. 1, 8-9 (citation omitted). A *Terry* stop is "an exception to the Fourth Amendment's warrant requirement" that allows officers to conduct a brief investigative stop "so long as they have 'reasonable, articulable suspicion' of criminal conduct." *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007) (citations omitted). A *Terry* stop occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a person," and a reasonable person would not feel free to leave. *Rice v. D.C.*, 774 F. Supp. 2d 18, 22 (D.D.C. 2011) (citations omitted). The reasonable suspicion standard justifying a *Terry* stop is "considerably less than probable cause, and *Terry*

6

stops are constitutional if the police can show a 'minimal level of objective justification.'" *United States v. Davis*, 235 F.3d 584, 586 (D.C. Cir. 2000) (internal citation omitted).  In *Terry,* the Supreme Court prescribed a two-part test to evaluate the reasonableness of a stop: "[1] whether the officer's action was justified at its inception, and [2] whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. "[I]n judging the reasonableness of the actions of the officer the circumstances before him are not to be dissected and viewed singly; rather they must be considered as a whole." *United States v. Hall*, 525 F.2d 857, 859 (D.C. Cir. 1976).

 The court finds that Defendant's stop of the Plaintiff meets both parts of *Terry's* reasonableness test.  The parties do not dispute that Defendant was responding to radio lookouts describing a suspect fleeing a nearby armed robbery as being a tall, bald, African-American male with a light or medium complexion, bald, wearing a light colored shirt, and carrying a large gun. (Def.'s SOUMF ¶ 6; Pl.'s Resp. to Def.'s SOUMF ¶ 6).  Plaintiff is a bald, 5'6" African-American male, who was wearing a white t-shirt and blue shorts at the time of the stop, and was crouching beside a car in the vicinity of the robbery. (Def.'s SOUMF ¶¶ 2, 7; Pl.'s Opp'n. Ex. B).  Even though Plaintiff did not match every aspect of the broadcast description, the court finds it was reasonable for the officer to make an investigatory stop under these circumstances.  *See United States v. Bailey*, 622 F.3d 1, 6 (D.C. Cir. 2010) (internal citation omitted) ("An officer may initiate a *Terry* stop based not on certainty but on the need 'to 'check out' a reasonable suspicion.'"); *see also Davis*, 235 F.3d at 587-588 (police had reasonable suspicion to stop a man matching lookout descriptions in terms of clothing, approximate location, and race.); *United States v. Abdus-Price*, 518 F.3d 926, 931 (D.C. Cir. 2008) ("In demanding a perfect match to a lookout description, [defendant] is asking us to fast-forward the criminal process to the jury trial

7

phase. This we cannot do. *Terry's* reasonable suspicion standard demands less of the government than the preponderance standard."). Additionally, when Plaintiff refused Defendant's commands to put his hands on his head, Defendant was not obligated to turn and walk away and risk his safety; on the contrary, once an officer makes a lawful stop, he "should not be denied the opportunity to protect himself" by taking actions such as conducting a frisk of a suspect. *Abdus-Price*, 518 F.3d at 931-932.

Having found the initial stop of Plaintiff to be permitted under *Terry,* the court must next determine whether the stop was converted into a full arrest, and, if so, whether that arrest was lawful. The parties agree that once backup arrived, Plaintiff was handcuffed,[4] and Plaintiff alleges in his Deposition and Opposition that when backup arrived, all of the officers, including Defendant, pointed their weapons at him. (Def.'s Mot. for Summ. J., Ex. 1, Pl. Dep. 19: 2-4). Viewing the evidence in the light most favorable to the Plaintiff, the question of whether Plaintiff was arrested or not becomes a closer question. "[D]eciding what degree of force is permissible, courts must look to 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The court finds that the fact that the officers drew their weapons and pointed them at Plaintiff and then handcuffed him until his identification was confirmed does not convert the stop

---

[4] As will be discussed below, Plaintiff states in his Opposition (for the first time) that Defendant handcuffed him. (Pl.'s Opp'n. at 1) However, in his Deposition, Plaintiff makes clear that Defendant did not handcuff him, an unknown officer did, (Mot. for Summ. J., Ex. 1, Pl. Dep. 24:11-21), and in his Response to Defendant's SOUMF ¶ 18, Plaintiff concedes that Defendant did not handcuff him. (Pl.'s Resp. to Def.'s SOUMF ¶ 18).

to a full arrest, given that the police were searching for an armed suspect, and Plaintiff had continue to refuse to put his hands on top of his head.  "Courts have consistently upheld the reasonable use or show of force during investigative stops in order to protect police officers in potentially dangerous situations," and the court finds that this was such a situation.  *Hargraves v. Dist. of Columbia*, No. 12-1459 (BAH), 2015 WL 5611550, at *7 (D.D.C. Sept. 22, 2015); *see also United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011) ("Because the officers were investigating an armed robbery, it was reasonable for them to approach the Cadillac with weapons drawn");  *Hicks v. United States*, 730 A.2d 657, 661 (D.C. App. 1999) (approaching stopped car based on a lookout description with guns drawn proper when police responding to radio report of "robbery," because robbery "is a violent crime"); *In re I.J.*, 906 A.2d 249, 257-258 (D.C. 2006) (citing *Hicks* for the proposition that "a 'trend [in expanding the scope of *Terry*] has led to permitting the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention.'").  "The amount of force used to carry out the stop and search must be reasonable, but may include using handcuffs or forcing the detainee to lie down to prevent flight, or drawing guns where law officers reasonably believe they are necessary for their protection." *United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989) (citations omitted); *see also Hargraves*, 2015 WL 5611550, at *7 (citing, 490 U.S. at 396) ("the use of handcuffs during a *Terry* stop does not automatically convert it into an arrest since 'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'").

       The court also finds that the length of time that Plaintiff was stopped was not excessive enough to cross the threshold into an unlawful arrest.  "To 'assess [ ] whether a detention is too

9

long in duration to be justified as an investigative stop, we . . . examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *United States v. Vinton*, 594 F.3d 14, 24 (D.C. Cir. 2010) (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). Defendant could not dispel his suspicions of Plaintiff's possible involvement in the armed robbery while Defendant was alone and Plaintiff refused to comply with his order to put his hands on his head. Once backup arrived, Plaintiff, who was still refusing to put his hands on his head, was handcuffed, and the police were able to confirm that Plaintiff lived at the location where he had been stopped and that he was not, in fact involved in the robbery. At that point, the handcuffs were removed. *See Ramsey v. United States*, 73 A.3d 138, 143 (D.C. 2013) (citing *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009)) ("[a]lthough an officer may effect a stop once he observes conduct that leads him reasonably to conclude that criminal conduct may be afoot, termination of the encounter is required once the officer's suspicion is dispelled and probable cause fails to develop."). The court therefore finds that the Defendant acted reasonably, and any actions which took place once backup arrived did not convert this lawful investigatory stop into a full-blown arrest.

In sum, the undisputed facts are: (i) that Defendant was looking for a tall, bald, African-American man with light to medium complexion and wearing a light colored shirt, and who was possibly armed, in the vicinity of a recent armed robbery; (ii) Plaintiff is a 5'6", bald, African-American man with a dark complexion, and was wearing a white shirt; (iii) Plaintiff had just finished jogging and was "kneeling down to catch his breath" next to his parked car, in front of his home, which is approximately half a mile from the scene of the robbery; (iv) Defendant stopped Plaintiff, told him he fit the description of someone involved in an armed robbery, and asked him to put his hands on his head; (v) Plaintiff refused to comply, told Defendant that he

had been jogging, and that he had done nothing wrong; (vi) Defendant drew his weapon, keeping it pointed at the ground, and detained Plaintiff until backup officers arrived; (vii) Ten to fifteen minutes later, the backup officers arrived, drew their weapons, handcuffed Plaintiff, and then released him after his mother provided them with a copy of his driver's license.  Based on these facts and the record before it, the court finds that the Defendant's stop and detention of Plaintiff was a lawful investigative stop, not an arrest, and the court will therefore grant Defendant's motion for summary judgment on Plaintiff's claims of false arrest (Count I) and unwarranted seizure (Count III).

### B. Assault & Battery (Count II)

"Assault and battery are distinct causes of action.  Battery involves 'an intentional act that causes a harmful or offensive bodily contact.'" *Dingle v. D.C.*, 571 F. Supp. 2d 87, 98 (D.D.C. 2008) (citing *Jackson v. Dist. of Columbia*, 412 A.2d 948, 955 (D.C. 1980)).  On the other hand, an allegation of assault "must involve 'an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim.'" *Id.* (citing *Etheredge v. Dist. of Columbia*, 635 A.2d 908, 916 (D.C.1993)).

Defendant argues that since the *Terry* stop of Plaintiff was lawful, and because Plaintiff does not allege that Defendant used excessive force, the assault and battery claim fails as a matter of law.  (Mot. for Summ. J. at 8).  Defendant also argues that police officers possess a qualified privilege to use reasonable force to effect an arrest or stop, and in this situation, the only time Defendant touched Plaintiff was to make sure his handcuffs were on correctly.  (*Id.* at 8-9).

Plaintiff alleges in his Opposition that Defendant pointed his service weapon at Plaintiff and handcuffed him.  (Pl.'s Opp'n. at 1).  However, Plaintiff's Complaint, Amended Complaint, and deposition testimony contain no such assertion, and he contradicts this assertion in his

11

Response to Defendant's Statement of Undisputed Material Fact by not contesting that another officer handcuffed him. (*See* Mot. for Summ J., Ex 1 Dep. 21:11-18; 24:11-21; Pl.'s Resp. to Def.'s SOUMF ¶ 18).). Prior to the filing his Opposition, Plaintiff only alleged that Defendant touched him once, when he checked Plaintiff's handcuffs to ensure they were put on correctly. (Mot. for Summ. J., Ex. 1, Pl. Dep. 24:11-21). Plaintiff cannot create a genuine issue of material fact by changing his story in his summary judgment pleadings. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (lower courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."). The court will therefore disregard this new allegation and examines the prior undisputed record.

A police officer in the District of Columbia has "a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not 'in excess of those which the actor reasonably believes to be necessary.'" *Etheredge*, 635 A.2d at 916 (quoting *Jackson*, 412 A.2d at 956). "The D.C. Court of Appeals has utilized the standard for excessive force under § 1983, as articulated in *Graham v. Connor* to 'inform[ ] the privileged use of force analysis for assault and battery claims under District of Columbia common law.'" *Cotton v. D.C.*, 541 F. Supp. 2d 195, 208 (D.D.C. 2008) (citations omitted). "[F]or a use of force to be non-privileged, 'the means employed [must be] in excess of those which the actor reasonably believes to be necessary." *Maddux v. D.C.*, No. CV 14-00351 (APM), 2015 WL 7274030, at *10 (D.D.C. Nov. 16, 2015) (quoting *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C.1997)). Some of the "[k]ey considerations in making a reasonableness determination include 'the severity of the

crime at issue, whether the suspect poses an immediate threat to the safety of the officers . . . and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at *9 (citations omitted). The Supreme Court has made clear that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-397.

Plaintiff admits that when Defendant stopped him while investigating an armed robbery, Plaintiff refused to comply with his instruction to put his hands on his head. Defendant drew his weapon and detained Plaintiff until backup arrived. Plaintiff continued to refuse to put his hands on his head, whereupon other officers drew their weapons and handcuffed him. Defendant touched Plaintiff to ensure the handcuffs fit properly, then did not touch Plaintiff again. Under these circumstances, no reasonable juror could find that the Defendant's actions amounted to an assault or battery. *See Taylor v. United States*, 103 F. Supp. 3d 87, 94 (D.D.C. 2015) (quoting *Scott*, 101 F.3d at 759) ("the excessiveness of the force [must] be so apparent that no reasonable officer could have believed in the lawfulness of his actions."); *see also Dingle*, 571 F. Supp. 2d at 98 (citation omitted) (when a stop is lawful, "unless the threatened use of force is clearly excessive, an officer is protected against liability for assault."). The court will therefore grant Defendant's motion for summary judgment as to the assault and battery claim (Count II).

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion is GRANTED.

A corresponding order will issue separately.  Date:  April 1, 2016

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge